661 A.2d 284

LINDA HAWKINS, PLAINTIFF–APPELLANT, v. BRIAN HARRIS, STEPHEN HOPKINS, BRAFF, EWH & S, SEARCH INVESTIGATIONS, INC., ALEX TOIA, STATE FARM INSURANCE ÇO., AND NEW JERSEY AUTOMOBILE FULL INSURANCE UNDERWRITING ASSOCIATION (JUA), DEFENDANTS–RESPONDENTS, AND HANOVER INSURANCE CO., DEFENDANT.

Argued September 12, 1994—Reargued May 1, 1995—Decided July 27, 1995.

*Eldridge Hawkins* argued the cause for appellant.

*Hugh Francis* argued the cause for respondent New Jersey Automobile Full Insurance Underwriting Association (*Francis & Berry*, attorneys; *Mr. Francis*, of counsel; *Raymond N. Torres, Jr.*, on the brief).

*David L. Hack* argued the cause for respondent State Farm Mutual Automobile Insurance Company (*Hack, Piro, O'Day, Merklinger, Wallace & McKenna*, attorneys; *Mr. Hack*, of counsel; *Douglas J. Olcott*, on the brief).

*Thomas F. Quinn* argued the cause for respondents Search Investigations, Inc. and Alex Toia (*Wilson, Elser, Moskowitz, Edelman & Dicker*, attorneys; *Mr. Quinn, Judith A. Woods, Brian E. Moffitt*, on the briefs).

*Jeffrey M. Kadish* argued the cause for respondents Brian Harris, Stephen Hopkins and Braff, and EWH & S (*Morgan, Melhuish, Monaghan, Arvidson, Abrutyn & Lisowski,* attorneys).

*Michael K. Furey* argued the cause for *amicus curiae* New Jersey State Bar Association (*William B. McGuire,* President, attorney; *Mr. Furey, Danielle E. Reid,* and *Raymond A. Noble,* on the brief).

The opinion of the Court was delivered by

O'HERN, J.

Plaintiff alleges that in the course of her personal injury action against two motorists, she was subjected to repeated indignities by private investigators acting on behalf of an insurance company and a law firm representing one of the motorists. The Appellate Division has ordered a trial to determine whether defendants intentionally inflicted emotional distress on plaintiff, and whether defendants invaded plaintiff's privacy. The Appellate Division was divided on one issue, which is the subject of this appeal. The question is whether the absolute privilege accorded to statements made by participants in judicial proceedings extends to statements made by private investigators employed by the parties or their representatives. We agree with the majority of the Appellate Division panel that the absolute privilege does extend to statements made by private investigators. We affirm the judgment below.

I

Because the case arises on the defendants' motions for summary judgment, we may accept as true the facts as set forth in plaintiff's papers. On July 1, 1987, plaintiff, Linda Hawkins, had an automobile accident, which left her physically and mentally disabled. On July 14, 1987, Mrs. Hawkins was involved in another automobile accident, which worsened her condition. She filed lawsuits against the two responsible motorists. The two cases were consolidated for discovery and trial. A jury returned a verdict in favor of Mrs.

Hawkins for approximately $435,000. Thereafter, the motorists in the underlying action settled the case for $350,000.

On April 10, 1991, plaintiff filed a seven-count complaint against various attorneys, insurance companies, and investigators involved in the underlying litigation. We shall refer to them as the lawyer-defendants, the insurer-defendants, and the investigator-defendants. The insurer-defendants were the insurers of the various defendants in the automobile accident case. The lawyer-defendants were attorneys for one of the motorists in the underlying case. The lawyer-defendants and insurer-defendants had hired the investigator-defendants—Search Investigations, Inc., and Alex Toia—to gather information about the accidents and the consequential damages claimed by plaintiff. Plaintiff's complaint included allegations that the investigator-defendants defamed her during their investigation.

All defendants moved to dismiss plaintiff's complaint for failure to state a cause of action. Plaintiff moved to amend her complaint. Judge Yanoff dismissed the complaint and denied plaintiff's motion to amend. Thereafter, Judge Loftus signed an order granting the plaintiff leave to amend her complaint. When defendants notified Judge Loftus of Judge Yanoff's previous denial of the motion to amend, Judge Loftus vacated her order.

The Appellate Division clarified plaintiff's right to file an amended complaint and reversed the trial court's dismissal of plaintiff's claims for invasion of privacy, negligent infliction of emotional distress, and conspiracy. The Appellate Division affirmed the trial court's dismissal of plaintiff's other claims. One member of the Appellate Division panel dissented from the part of the decision affirming the dismissal of plaintiff's defamation claims against the investigator-defendants. He found three allegations in the amended complaint especially troubling: (1) investigator-defendants contacted an attendant at Mrs. Hawkins' health club and asked him how long he had been having an affair with her; (2) investigator-defendants twice contacted Mrs. Hawkins' minister and informed him that she and her husband were committing

insurance fraud; and (3) investigator-defendants contacted Mrs. Hawkins' housekeeper and asked her how much money Mrs. Hawkins was paying her to lie.

Those words, portraying plaintiff as an unfaithful spouse, insurance cheat, and as a suborner of perjury, could amount to actionable defamation unless privileged. The dissenting member of the panel acknowledged that lawyers are given an absolute immunity for statements made in the course of judicial proceedings so that they may exercise unfettered judgment in their clients' interest. Nevertheless, he would "limit investigators to the benefit of a qualified privilege, holding them responsible for otherwise defamatory language if the [investigator] knows the statement to be false, or utters it in reckless disregard of its truth or falsity." Plaintiff appeals to us as of right on the basis of the dissent below. The only issue before us, then, is whether the investigator-defendants' statements were absolutely privileged.

## II

Although defamatory, a statement will not be actionable if it is subject to an absolute or qualified privilege. A statement made in the course of judicial, administrative, or legislative proceedings is absolutely privileged and wholly immune from liability. That immunity is predicated on the need for unfettered expression critical to advancing the underlying government interest at stake in those settings.

[*Erickson v. Marsh & McLennan Co., Inc.*, 117 *N.J.* 539, 563, 569 *A.*2d 793 (1990) (citations omitted).]

The trouble with privileges is that they are granted to good and bad alike. A legislator has an absolute privilege on the floor of a chamber to revile, to defame, or to distort the truth. Invoking the Speech and Debate Clause, *U.S. Const.* art. I, § 6, a lawmaker may use this provision "as a cloak of immunity from prosecution while he [is] smearing the reputations and characters of American citizens whom the Bill of Rights [had] been designed to protect." Albert Coates, *Preserving the Constitution: The Autobiography of Senator Sam Ervin*, 63 *N.C.L.Rev.* 993, 994 (1985) (book review). We accept such a privilege because it is more important to allow a lawmaker to speak and vote freely on matters of public

concern than it is to punish the lawmaker as a rogue. The Speech and Debate Clause protects the integrity of the legislative process by preventing the "intimidation of legislators by the Executive and accountability before a possibly hostile judiciary." *Gravel v. United States,* 408 *U.S.* 606, 617, 92 *S.Ct.* 2614, 2623, 33 *L.Ed.*2d 583, 597 (1972).

A corresponding privilege extends to members of the judiciary in the performance of judicial duties.

> Few doctrines were more solidly established at common law than the immunity of judges from liability for damages for acts committed within their judicial jurisdiction, as [the] Court recognized when it adopted the doctrine, in *Bradley ·v. Fisher,* 13 Wall. 335, 20 L.Ed. 646 (1871). This immunity applies even when the judge is accused of acting maliciously and corruptly, and it "is not for the protection or benefit of a malicious or corrupt judge, but for the benefit· of the public, whose interest it is that the judges should be at liberty to exercise their functions with independence and without fear of consequences." (*Scott v. Stansfield,* LR 3 Ex 220, 223 (1868), quoted in *Bradley v. Fisher, supra,* [13 Wall. at] 349; note, at 350, 20 L.Ed. at 650.)
>
> [*Pierson· v. Ray,* 386 *U.S.* 547, 554, 87 *S.Ct.·*1213, 1217–18, 18 *L.Ed.*2d 288, 294 (1967).]

"The principle of judicial immunity has remained viable in the face of challenges in some very emotionally and politically charged cases." *Jarvis v. Drake,* 250 *Kan.* 645, 830 *P.*2d 23, 26 (1992).

The extension of an absolute privilege to jurors, witnesses, and parties and their representatives is grounded in similar public-policy concerns. In *Fenning v. S.G. Holding Corp.,* 47 *N.J.Super.* 110, 135 *A.*2d 346 (App.Div.1957), the late Chief Justice Hughes, then sitting in the Appellate Division, explained our adherence to the doctrine of litigation immunity:

> The doctrine that an absolute immunity exists in respect of statements, even those defamatory and malicious, made in the course of proceedings before a court of justice, and having some relation thereto, is a principle firmly established, and is responsive to the supervening public policy that persons in such circumstances be permitted to speak and write freely without the restraint of fear of an ensuing defamation action, this sense of freedom being indispensable to the due administration of justice.
>
> [*Id.* at 117, 135 *A.*2d 346 (citations omitted).]

Our doctrine derives from the English rule of immunity. The English rule differs slightly from the American rule in that

England affords a true, absolute privilege without regard to the relevancy of the statements to the subject matter of the proceedings. *Id.* at 118, 135 *A.2d* 346 (citing *Munster v. Lamb*, [1883] 11 *Q.B.D.* 588).

> The only dilution of the rule [of absolute immunity] which has occurred in New Jersey (and most American jurisdictions) is the requirement that the defamatory matter uttered have some relation to the nature of the proceedings. Thus, statements made in the course of judicial proceedings, but not relevant thereto, are excluded from the privilege.
>
> [*Devlin v. Greiner*, 147 *N.J.Super.* 446, 453, 371 *A.2d* 380 (Law Div.1977).]

The litigation privilege is still widely accepted. *See Restatement (Second) of Torts* §§ 586–87 (1977) (reaffirming absolute privilege of parties and their attorneys if the defamatory statements have "some relation to the proceeding"); *see also Uniform Defamation Act* (Tentative Draft 1992) (providing an absolute privilege for statements made "in and pertaining to a judicial proceeding by a judge, attorney, witness, juror, or other participant"), *reprinted in* Robert J. Hawley, *An Overview of the Uniform Defamation Act, in* Libel Litigation 1992, at 645 app. (PLI Patents, Copyrights, Trademarks, and Literary Property Course Handbook Series No. 338), *available in* WESTLAW, PLI–PAT Database.

Although the public policy served by the absolute privilege immunizes the defamer from a civil damage action, the privilege does not protect against professional discipline for an attorney's unethical conduct. *Ruberton v. Gabage*, 280 *N.J.Super.* 125, 134, 654 *A.2d* 1002 (App.Div.1995); *Kirschstein v. Haynes*, 788 *P.2d* 941, 950–51 (Okla.1990). Nor does the privilege protect a witness or party who testifies falsely from a perjury prosecution. *Kirschstein, supra,* 788 *P.2d* at 950–51. "Remedies for perjury, slander, and the like committed during judicial proceedings are left to the discipline of the courts, the bar association, and the state." *Wright v. Yurko*, 446 *So.2d* 1162, 1164 (Fla.Dist.Ct.App.1984).

## III

The California Supreme Court set forth a useful formulation of the litigation privilege in *Silberg v. Anderson*, 50 *Cal.*3d

205, 266 *Cal.Rptr.* 638, 786 *P.*2d 365 (1990). Although California's litigation privilege has been codified, the underlying principles are substantially the same as those underlying the New Jersey privilege. The absolute privilege applies to "any communication (1) made in judicial or quasi-judicial proceedings; (2) by litigants or other participants authorized by law; (3) to achieve the objects of the litigation; and (4) that have some connection or logical relation to the action." *Id.* at 369. Whether a defendant is entitled to the privilege is a question of law. *Devlin, supra,* 147 *N.J.Super.* at 460, 371 *A.*2d 380. Because the most difficult question in this case is whether investigator-defendants should be considered "litigants" or "other participants authorized by law," we will address that issue last.

### 1. Were the investigator-defendants' statements made in the course of judicial proceedings?

The litigation privilege is not limited to statements made in a courtroom during a trial; "it extends to all statements or communications in connection with the judicial proceeding." *Ruberton, supra,* 280 *N.J.Super.* at 133, 654 *A.*2d 1002. For example, the privilege covers statements made during settlement negotiations. *Id.* at 132–34, 654 *A.*2d 1002. The privilege also protects a person while engaged in a private conference with an attorney regarding litigation. *Middlesex Concrete Prods. & Excavating Corp. v. Carteret Indus. Ass'n,* 68 *N.J.Super.* 85, 92, 172 *A.*2d 22 (App.Div.1961). Such application of the privilege affords litigants and witnesses "the utmost freedom of access to the courts without fear of being harassed subsequently by derivative tort actions." *Silberg, supra,* 786 *P.*2d at 369 (citation omitted).

Thus, the privilege extends to "preliminary conversations and interviews between a prospective witness and an attorney if they are in some way related to or connected with a pending or contemplated action." *Ascherman v. Natanson,* 23 *Cal.App.*3d 861, 100 *Cal.Rptr.* 656, 659 (1972). One purpose of the privilege is to encourage "open channels of communication and the presenta-

tion of evidence" in judicial proceedings. *McClatchy Newspapers, Inc. v. Superior Court,* 189 *Cal.App.*3d 961, 970, 234 *Cal.Rptr.* 702 (Ct.App.1987). Such open communication is "a fundamental adjunct to the right of access to judicial and quasi-judicial proceedings." *Pettitt v. Levy,* 28 *Cal.App.*3d 484, 104 *Cal.Rptr.* 650, 654 (Ct.App.1972). The reason has been well explained:

A witness' apprehension of subsequent damages liability might induce two forms of self-censorship. First, witnesses might be reluctant to come forward to testify. And once a witness is on the stand, his testimony might be distorted by the fear of subsequent liability. Even within the constraints of the witness' oath there may be various ways to give an account or to state an opinion. These alternatives may be more or less detailed and may differ in emphasis and certainty. A witness who knows that he might be forced to defend a subsequent lawsuit, and perhaps to pay damages, might be inclined to shade his testimony in favor of the potential plaintiff, to magnify uncertainties, and thus to deprive the finder of fact of candid, objective, and undistorted evidence. But the truthfinding process is better served if the witness' testimony is submitted to "the crucible of the judicial process so that the factfinder may consider it, after cross-examination, together with the other evidence in the case to determine where the truth lies." *Imbler v. Pachtman,* 424 US 409, 440, 47 LEd2d 128, 96 SCt 984 [999] (1976) (White, J., concurring in judgment).

[*Briscoe v. LaHue,* 460 *U.S.* 325, 333–34, 103 *S.Ct.* 1108, 1114–15, 75 *L.Ed.*2d 96, 106–07 (1983) (citations omitted).]

Just as we wish witnesses to have absolute freedom to express the truth as they view it, we wish parties to have an unqualified opportunity to explore the truth of a matter without fear of recrimination.

■ We are satisfied that the pretrial discussions between the investigator-defendants and the witnesses were made in the course of the underlying personal injury litigation.

### 2. Were the investigator-defendants' statements made to achieve the objects of the litigation?

■ Pretrial investigation is "necessary to a thorough and searching investigation of the truth," Van V. Veeder, *Absolute Immunity in Defamation: Judicial Proceedings,* 9 *Colum.L.Rev.* 463, 477 (1909), and, therefore, essential to the achievement of the objects of litigation. In *Devlin, supra,* 147 *N.J.Super.* at 458, 371 *A.*2d 380, the court implicitly recognized that the statements of a

private investigator made during the course of the proceeding would be covered by the privilege, but found that in the circumstances of that case the investigation was too remote from any anticipated litigation.

> The evaluation and investigation of facts and opinions for the purpose of determining what, if anything, is to be raised or used in pending litigation is as integral a part of the search for truth and therefore of the judicial process as is the presentation of such facts and opinions during the course of the trial, either in filed documents or in the courtroom itself.
>
> [*Adams v. Peck*, 288 *Md.* 1, 415 *A.*2d 292, 295 (1980).]

Pretrial communications by parties and witnesses are protected "to promote the development and free exchange of information and to foster judicial and extra-judicial resolution of disputes." *General Elec. Co. v. Sargent & Lundy*, 916 *F.*2d 1119, 1129 (6th Cir.1990).

■ The investigations took place in the course of the underlying automobile accident litigation. The disputes therefrom were not resolved before trial, but they might have been. We are satisfied that the *investigations* were undertaken to achieve the objects of the litigation. Whether the *statements* were made to achieve the objects of the litigation depends on their relationship to the investigation.

3. Did the investigator-defendants' statements have some connection or logical relation to the action?

■ To be privileged, a defamatory statement must have some relation to the course of the proceedings. *Fenning, supra,* 47 *N.J.Super.* at 117, 135 *A.*2d 346. "The pertinency thus required is not a technical legal relevancy, such as would, necessarily, justify insertion of the matter in a pleading or its admission into evidence, but rather a general frame of reference and relationship to the subject matter of the action." *Id.* at 118, 135 *A.*2d 346.

■ That requirement "was never intended as a test of a participant's motives, morals, ethics or intent." *Silberg, supra,* 786 *F.*2d at 374. So, too, the morals, ethics, and values of the investigators here cannot resolve the issue of relatedness. The

question is whether the three statements at issue were in any way relevant to the proceedings. The allegedly defamatory statements concerning insurance fraud and the subornation of a witness were clearly relevant to the underlying litigation. However, we are less certain about the relevance to the proceedings of plaintiff's claimed infidelity. "[E]xtrajudicial defamatory allegations relating to a party's honesty are not sufficiently 'pertinent' to a judicial proceeding to clothe them with an absolute privilege, when the only basis alleged for finding the allegations pertinent is that the defamed party's credibility was at issue." *Demopolis v. Peoples Nat'l Bank,* 59 *Wash.App.* 105, 796 *P.*2d 426, 431 (1990). We shall return to the issue of relevancy in our disposition.

### 4. Were the investigator-defendants "other participants authorized by law"?

■ Whether investigators are "other participants authorized by law" is the crucial issue. Had an insurance company for the defendants in the underlying litigation conducted the investigations, the company would have been regarded as a participant authorized by law because of its undoubted interest in the outcome of the proceedings. *Petty v. General Accident Fire & Life. Assurance Corp.,* 365 *F.*2d 419, 421 (3d Cir.1966) (applying New Jersey law); *Doctors' Co. Ins. Servs. v. Superior Court,* 225 *Cal.App.*3d 1284, 275 *Cal.Rptr.* 674, 680–82 (1990). The immunity that attends judicial proceedings "protects both counsel and *other representatives* who are employed to assist a party in the course of litigation." *Petty, supra,* 365 *F.*2d at 421 (emphasis added). The privilege protects an attorney's agents and employees in what they do at the attorney's request. *Youmans v. Smith,* 153 *N.Y.* 214, 47 *N.E.* 265, 267 (1897). Thus, in *Middlesex Concrete Products, supra,* 68 *N.J.Super.* at 92, 172 *A.*2d 22, the court found that the litigation privilege immunized accusations made by an engineering consultant working for a defendant in a pending lawsuit.

■ The closest case on point is *Leavitt v. Bickerton,* 855 *F.Supp.* 455 (D.Mass.1994). In that case, the mother of a brain-

damaged child had sued the birthing physician for malpractice. During the malpractice action, the mother's attorney sent a letter about the suit to the medical school where the birthing physician taught. The physician, in turn, sued the mother and her attorney for libel. While investigating the libel case, a private investigator working for the physician's attorney interviewed the mother's former employers and suggested that she had used alcohol during the pregnancy. The mother sued the doctor's attorney and investigator for defamation and intentional infliction of emotional distress. The court acknowledged that the investigator "could have used a more tactful method of inquiry or otherwise saved Mrs. Leavitt humiliation and grief," but it concluded that to be privileged the statement "need only be made in the course of judicial proceedings and be, in some way, related to those proceedings." *Id.* at 458. The private investigator's inquiries met those requirements and were therefore privileged. *Ibid.* The court concluded:

> Finally, it is of little significance that the statements made to Mrs. Leavitt's former employers were made by a private investigator and not by an attorney. The privilege conferred upon attorneys relates to their function as an advocate on behalf of their client, as is evidenced by the requirement that statements be made in the context of pending or ongoing litigation. Thus, insofar as [the investigator] was engaged in a function which would be protected had it been undertaken by an attorney, he is entitled to absolute immunity while acting as an agent of an attorney.

> [*Ibid.* (citation omitted).]

We believe that that is the correct legal analysis. *See Devlin, supra,* 147 *N.J.Super.* at 458, 371 *A.*2d 380 (assuming that private investigator would be covered by absolute privilege if investigator's statements had been made in actual course of judicial proceedings). Just as the legislative privilege extends to the aide of the legislator, *Gravel, supra,* 408 *U.S.* at 621, 92 *S.Ct.* at 2624–25, 33 *L.Ed.*2d at 600, the litigation privilege should extend to the aide of an attorney in the course of legal proceedings.

 Because of their extraordinary scope, absolute privileges "have been limited to situations in which authorities have the power both to discipline persons whose statements exceed the bounds of permissible conduct and to strike such statements from

the record." *Moore v. Smith*, 89 *Wash.*2d 932, 578 *P.*2d 26, 29 (1978). The absolute privilege "does not extend to statements made in situations for which there are no safeguards against abuse." *Demopolis, supra*, 796 *P.*2d at 430. *See also Rainier's Dairies v. Raritan Valley Farms, Inc.* 19 *N.J.* 552, 562, 117 *A.*2d 889 (1955) ("[I]n strictly judicial proceedings the potential harm which may result from the absolute privilege is somewhat mitigated by the formal requirements such as notice and hearing, the comprehensive control exercised by the trial judge whose action is reviewable on appeal, and the availability of retarding influences such as false swearing and perjury prosecutions * * *."); *Binkewitz v. Allstate Ins. Co.*, 222 *N.J.Super.* 501, 510, 537 *A.*2d 723 (App.Div.) ("Judges and lawyers answer to their oaths and are subject to discipline for misconduct in court; parties and witnesses speak under oath or similar restraint, and may be punished for irresponsible speech."), *certif. denied*, 113 *N.J.* 378, 550 *A.*2d 481 (1988). A corresponding burden, then, that flows from the benefits of the privilege is an attorney's ethical and professional responsibility for the conduct of aides. *Cf. In re Opinion No. 24*, 128 *N.J.* 114, 127–30, 607 *A.*2d 962 (1992) (reminding attorneys of their responsibility to supervise paralegals, whether employees or independent contractors).

## IV

We are satisfied that the privilege should extend to the relevant statements of investigators made in the course of pretrial discovery. Courts have the power and authority to impose sanctions (for example, the suppression of improperly adduced evidence) on parties for an abuse of the discovery process. In addition, some private investigators will be subject to State licensure procedures. Finally, an attorney may be held professionally responsible for a lack of supervision of such investigators.

This litigation immunity, of fourteenth century origin, protects lawyers, judges, witnesses, parties, and jurors. Judith Kilpatrick, *Regulating the Litigation Immunity: New Power and a Breath*

of *Fresh Air for the Attorney Discipline System*, 24 *Ariz.St.L.J.* 1069, 1072 (1992). "In providing this protection, English courts were concerned that justice would be impaired if those involved in court proceedings could be sued for statements made 'in the discharge of their public duties or in pursuing their rights.'" *Ibid.* (quoting Veeder, *supra*, 9 *Colum.L.Rev.* at 469).

> Given the importance to our justice system of ensuring free access to the courts, promoting complete and truthful testimony, encouraging zealous advocacy, giving finality to judgments, and avoiding unending litigation, it is not surprising that * * * the litigation privilege[ ] has been referred to as "the backbone to an effective and smoothly operating judicial system."
>
> [*Silberg, supra*, 786 *P.*2d at 370 (quoting *McClatchy Newspapers, supra*, 189 *Cal.App.*3d at 970, 234 *Cal.Rptr.* 702).]

Those values are at least as important today as they were when the privilege originated 600 years ago. There must be an end to litigation.

The litigation privilege is not, however, a license to defame. A statement is privileged only if it has some relation to the proceeding. Because of the unusual procedural posture of this case, the trial court may not have fully considered the relevance to the underlying litigation of the investigator's alleged suggestion of plaintiff's adultery. That issue is not before us on this appeal.

The judgment of the Appellate Division is affirmed.

HANDLER, J., dissenting.

The Court acknowledges that plaintiff, seeking to recover for her personal injuries in an action against two motorists, "was subjected to repeated indignities by private investigators acting on behalf of an insurance company and a law firm representing one of the motorists." *Ante* at 211, 661 *A.*2d at 286. The "indignities" she endured were slanderous remarks made about her—that she was an adulteress, a faker, a fraud, and a liar. The Court concludes that there is nothing plaintiff can do about those slanderous remarks. The Court holds that the policy of immunity in the law of defamation that grants an absolute privilege to statements made by participants in judicial proceedings extends to

statements made by private investigators employed by the parties or their representatives. *Ante* at 211, 661 *A*.2d at 286.

I strongly disagree with the Court's ruling. Substantially for the reasons expressed in the partial dissent of Judge Stein in the Appellate Division, I would limit investigators to a qualified privilege with respect to defamatory statements made in the course of an investigation that is not a direct part of a judicial proceeding.

## I

The law of defamation "embodies the important public policy that individuals and business entities should generally be free to enjoy their reputations unimpaired by false and defamatory attacks." *Rainier's Dairies v. Raritan Valley Farms, Inc.*, 19 *N.J.* 552, 557, 117 *A*.2d 889 (1955). In certain situations, however, "a paramount public interest [dictates] that persons be permitted to speak or write freely without being restrained by the possibility of an ensuing defamation action." *Id.* at 557–58, 117 *A*.2d 889; *see Fees v. Trow*, 105 *N.J.* 330, 336, 521 *A*.2d 824 (1987) (noting that "[t]he law of privilege is designed to protect speech in those narrowly defined instances in which the public interest in unrestrained communication outweighs the right of redress.")

Public policy encourages free and unconstrained communication in the administration of justice and, to that end, justifies an absolute privilege for those who participate or are involved in judicial or *quasi*-judicial proceedings. *Devlin v. Greiner*, 147 *N.J.Super.* 446, 455, 371 *A*.2d 380 (Law Div.1977). "The most noteworthy illustration of the absolute privilege or immunity is that afforded in judicial proceedings where judges, attorneys, witnesses, parties and jurors are fully protected against defamation actions based on utterances made in the course of the judicial proceedings and having some relation thereto." *Rainier's, supra,* 19 *N.J.* at 558, 117 *A*.2d 889.

The Court here invokes the four-part test espoused in *Silberg v. Anderson*, 50 *Cal.*3d 205, 266 *Cal.Rptr.* 638, 786 *P*.2d 365 (1990), to justify the application of the absolute privilege. *Ante* at 216, 661

*A*.2d at 289. One prong of that test requires that the communication in question be made by "litigants or other participants authorized by law." *Id.* 786. *P*.2d at 369. The majority concludes under that test the investigators were "participants" in the original tort litigation and that their statements were equivalent to statements made in the course of the judicial proceeding by persons directly involved in that proceeding. On that basis, the Court finds that the investigators are therefore entitled to the immunity of the absolute privilege.

Investigations that are related to litigation are not necessarily a constituent part of a judicial proceeding as such, nor do such investigations necessarily become "judicialized" by referring to them as "informal discovery." Investigators are neither parties, jurors, judges, attorneys, nor are they necessarily witnesses. With respect to witnesses, the importance of open communications is clearly identified by the majority. · The Court observes that

> A witness' apprehension of subsequent damages liability might induce two forms of self-censorship. First, witnesses might be reluctant to come forward to testify. And once a witness is on the stand, his testimony might be distorted by the fear of subsequent liability.
>
> [*Ante* at 216, 661 *A*.2d at 289 (citing *Briscoe v. LaHue*, 460 *U.S.* 325, 333, 103 *S.Ct.* 1108, 1114, 75 *L.Ed.*2d 96, 106 (1983) (citations omitted).]

How likely is it that a hired professional investigator will "be reluctant to come forward to testify"? Or that he will distort his testimony because he is afraid of being sued? Even though an investigator's statements may be afforded an absolute privilege if the investigator becomes a party witness, *see Devlin, supra,* 147 *N.J.Super.* at 458, 371 *A*.2d 380, that hardly justifies protecting an investigator's statements made in the course of unstructured, uncontrolled, and unsupervised "informal discovery," when the investigator is not a witness.

In *Devlin,* a husband hired an investigator to confirm suspicions that his wife was having an affair. The investigator's report contained statements substantiating an adulterous relationship. During the subsequent divorce proceeding, contents of the investigator's report were repeated by the investigator in the form of an

affidavit. After divorce was granted, the wife and her *alleged* paramour filed a complaint against the investigator raising numerous causes of action stemming from alleged fabrications in his report and subsequent affidavit. The investigator argued that he was entitled to immunity based on an absolute privilege because the alleged fabrications were made in the course of a judicial proceeding.

The *Devlin* court declined to grant summary judgment in favor of the investigator based on absolute privilege, finding that there was a question of fact as to whether the underlying report was prepared prior to the divorce litigation. *Id.* at 457–58, 371 *A.*2d 380. In other words, the court determined that the alleged fabrications may not have occurred in the course of a judicial proceeding, but rather in an extra-judicial setting and therefore, the absolute privilege may not attach.

Drawing support from case law, the Court concludes that an investigator hired by an attorney is entitled to an absolute privilege because he or she is a representative of that attorney. *Ante* at 220, 661 *A.*2d at 291. In support of that position the Court relies on *Middlesex Concrete Products and Excavating Corporation,* 68 *N.J.Super.* 85, 172 *A.*2d 22 (App.Div.1961). In that case, Middlesex contracted with the Borough of Carteret ("the Borough") to construct a sewage treatment facility. Due to allegations made by the Carteret Industrial Association, Middlesex became involved in litigation with the Borough. Philip B. Streander was retained by the Borough to perform an engineering investigation of the work performed by Middlesex. The results of Streander's investigation were extremely favorable to the Borough. During trial, Streander testified as an expert witness. Finding in favor of Middlesex, the trial court indicated that "Streander and his employees had knowingly used improper methods of computation ... in an attempt to make out a case of fraud [against Middlesex]." *Id.* at 89, 172 *A.*2d 22.

In a subsequent action, Middlesex filed suit against the Carteret Industrial Association and Streander for tortious interference with

its contract with the Borough. The basis of Middlesex's action against Streander was his fraudulent engineering investigation, report, and testimony. Streander moved for summary judgment on the basis of an absolute privilege. The Appellate Division affirmed the trial court's grant of summary judgment holding that "Streander's investigation, report, consultations, and testimony as an *expert witness* were made and given in the course of a judicial proceeding, and all had relation thereto." *Id.* at 92, 172 *A.*2d 22 (emphasis added).

The circumstances of this case are certainly distinguishable. As acknowledged by the *Middlesex* court, that case involves a course of communication between an expert witness and an attorney during the judicial proceeding, not statements made by investigators to third parties.

The Court further attempts to draw support from *Petty v. General Accident Fire & Life Assurance Corporation,* 365 *F.*2d 419 (3rd Cir.1966). In that case, a workman was injured during the construction of a building. He filed suit against numerous defendants including architects Petty and Croft. The worker claimed that the negligence of Petty and Croft in planning and constructing the building had caused him serious physical injury. Petty and Croft were insured against any liability arising from negligence in their professional work. The insurance policy provided the insurers with the obligation to defend any such suit and the right to make whatever settlement they might deem expedient.

In accordance with the policy, the insurers hired counsel to defend the action against Croft and Petty. The insurers, without the knowledge of Petty, directed counsel to settle the case against all defendants for $123,000 to which Petty and Croft would contribute $12,583.33. In the subsequent action for libel against the insurers, Petty contended that the terms of the settlement falsely "imputed ... to the plaintiff negligence and malpractice by him in his profession as an architect." *Id.* at 421. The insurers claimed immunity based on an absolute privilege. Petty responded that

the insurers had no such right because they were not parties to the initial litigation.

Technically, the insurers were not parties to the original litigation against Petty and Croft. However, recognizing that the insurers retained the counsel used by Petty, the court stated that "immunity which attends judicial proceedings protects both counsel and other representatives who are employed to assist a party in the course of litigation." *Ibid.* (noting *Middlesex, supra.*). That court further noted:

> The authority and interest of the insurance companies here and the status of counsel as Petty's attorney make this about as strong a case as could be for protecting their conduct as interested and authorized participants in the settlement to the same extent that a formal party would be protected.
>
> [*Id.* at 421–22.]

It cannot be overemphasized that the court extended the absolute privilege to the insurers because they were "interested and authorized participants" engaged in a distinct part of the judicial proceeding, the settlement of the claims against Petty and Croft. *Ante* at 216, 661 *A*.2d at 289.

In *Leavitt v. Bickerton,* 855 *F.Supp.* 455 (D.Mass.1994), considering factual circumstances somewhat similar to those in this case, the court chose to extend an absolute privilege to the investigator. However, neither that court nor this Court, bothers to explain why a qualified privilege would not provide reasonable protection for such investigatory statements. A qualified privilege, in my view, is sufficient to protect investigators and the attorneys who hire them without impinging on an investigator's ability to conduct a fruitful investigation.

The Court also indicates that an absolute privilege should extend to investigators by virtue of their agency relationship with an attorney. *Ante* at 221, 661 *A*.2d at 291–92. Because attorneys cannot conduct all aspects of litigation themselves, they often hire investigators or other agents to prepare for litigation. That consideration may serve to justify extending some type of protection to agents of attorneys for statements made in the course of a judicial or quasi-judicial proceeding, while under the control, di-

rection or supervision of an attorney. *See Youmans v. Smith, supra*, 153 *N.Y.* 214, 47 *N.E.* 265, 267 (1897) (acknowledging that "the privilege that protected [the attorney] also protected his agents and employees in whatever they did at his request that he could have lawfully done himself."). However, the fact that investigators may aid attorneys in preparing a case does not justify extending an unqualified and absolute privilege to investigators for statements made in the course of investigations.

By denying an absolute privilege to investigators who are not directly involved in a judicial proceeding, it is possible that the attorney who hired the investigators could, based on an agency relationship, ultimately bear responsibility for defamatory remarks made by an investigator. That possibility of vicarious liability itself may be fairly remote. The investigator would be protected by a qualified privilege. Even a qualified privilege is difficult to overcome in order to establish defamation liability. In any event, vicarious liability based on a qualified privilege may be just if the attorney could have prevented or discouraged the defamatory conduct by his or her agents. Rather than inhibiting or discouraging informal, extrajudicial discovery, the possibility of vicarious liability through a qualified privilege would promote more effective direction, control and supervision on the part of the attorney in the conduct of such informal discovery. Further, the more limited protection of the qualified privilege could itself constitute an incentive that investigators will act responsibly and fairly.

The policies of open communications and the search for the truth may favor affording an investigator an absolute privilege if and when that investigator becomes a witness to events or matters that are part of a judicial proceeding. *See Devlin, supra; Middlesex, supra.* In that context, the investigator, as any witness, should be encouraged to speak openly and fully without fear of reprisal. However, an investigation that may be related to a judicial proceeding, but is not an actual part of that proceeding, does not sufficiently implicate the strong need for open communi-

cations that attends the proceeding itself. To the contrary, without any constraints and absent fear of repercussion, investigators, as ruefully observed by Judge Stein, are encouraged to "go forth into the community like marauders, defaming others with impunity, making statements that they know are false or are made with reckless disregard of the truth" in an attempt to uncover witnesses and testimony favorable to their client's position.

Because the absolute privilege protects even malicious statements, courts have provided it to only a few categories of statements and "will not lightly extend the grant of absolute privilege to new situations unless the policy upon which the privilege is based is found to exist." *Devlin, supra,* 147 *N.J.Super.* at 456, 371 *A.*2d 380. As is noted, affording investigators with an absolute privilege does not necessarily promote open communications and the search for truth, but, as in this case, encourages insinuation, innuendo and insult.

Bestowing an unqualified and absolute privilege on investigators removes any assurance that they will try to avoid tactics that are injurious and harmful. In contrast, attorneys have incentives other than the threat of a defamation action to discourage them from making malicious or reckless false statements about others. For example, the *Rules of Professional Conduct* interdict malicious and/or defamatory statements by attorneys. *See, e.g., RPC* 3.4(b) (stating that an attorney shall not "falsify evidence, counsel or assist a witness to testify falsely."); *RPC* 4.1(a)(1) (prohibiting attorney from knowingly making false statements of material fact or law to third persons); *RPC* 8.4(c) (stating that an attorney may not "engage in conduct involving dishonesty, fraud, deceit or misrepresentation."). Investigators are not subject to similar strictures which encourage them not to defame third parties. As recognized by the majority, "the absolute privilege 'does not extend to statements made in situations for which there are no safeguards against abuse.'" *Ante* at 221, 661 *A.*2d at 291 (quoting *Demopolis v. Peoples Nat'l Bank,* 59 *Wash.App.* 105, 796 *P.*2d 426, 430 (1990)); *see Rainier's, supra,* 19 *N.J.* at 562, 117 *A.*2d 889.

Because informal discovery undertaken by investigators is not subject to judicial supervision, and is therefore subject to abuse, the absolute privilege should not be extended to investigators absent adequate safeguards. *See Schulman v. Anderson Russell Kill & Olick,* 117 *Misc.*2d 162, 458 *N.Y.S.*2d 448, 453 (Sup.Ct.1982) (acknowledging that absolute privilege does not protect statements rendered during informal discovery because of "the grave potential for abuse and bad faith in such informal quests for information.").

## II

In my view, the extension of an absolute privilege to investigators, endorsed by the majority, goes much too far. As exemplified by this case, the grant of immunity coupled with the absence of any ethical or legal constraints becomes a license to defame. The absolute privilege, reserved for participants in judicial proceedings, in the hands of hired investigators, does not genuinely or reasonably encourage or promote the truth—the only purpose intended to be achieved by applying the absolute privilege to judicial and quasi-judicial proceedings and those directly and substantially involved in such proceedings.

*For affirmance*—Justices POLLOCK, O'HERN, GARIBALDI and Judge MICHELS—4.

*For reversal*—Chief Justice WILENTZ, Justices HANDLER and STEIN—3.