47 N.J. Super. 110 (1957)
135 A.2d 346
HERMAN A. FENNING, PLAINTIFF-RESPONDENT,
v.
S.G. HOLDING CORP., A CORPORATION, AND SAMUEL PARIS, DEFENDANTS-APPELLANTS.
Superior Court of New Jersey, Appellate Division.
Argued October 7, 1957.
Decided October 21, 1957.
*111 Before Judges CLAPP, JAYNE and HUGHES.
*112 Mr. Irving I. Rubin argued the cause for appellants.
Mr. Daniel G. Kasen argued the cause for respondent (Messrs. Kasen, Schnitzer & Kasen, attorneys).
The opinion of the court was delivered by HUGHES, J.A.D.
A public emergency presented by the war-born shortage of housing, in the light of continuing economic pressures, was declared by our Legislature in 1950 (L. 1950, c. 234, p. 582, repealed L. 1953, c. 216, § 34, p. 1638) in justification of the need for stand-by state rent control, to be operative in the event of removal of federal controls. The anticipated expiration of all such federal controls on July 31, 1953 led to the enactment of L. 1953, c. 216, supra, continuing rent controls under certain conditions (N.J.S. 2A:42-41), and they were further extended by L. 1954, c. 260. The continuing concept of state rent control has weathered determined assaults upon its constitutional propriety (Jamouneau v. Harner, 16 N.J. 500 (1954); Brookchester v. Ligham, 17 N.J. 460 (1955); Stuyvesant Town, Inc., v. Ligham, 17 N.J. 473 (1955); Addiss v. Logan Corp., 23 N.J. 142 (1957)) to and including the most recent extender (L. 1956, c. 146; N.J.S. 2A:42-56 et seq.), adjudged constitutionally valid in the case of In re Freygang, 46 N.J. Super. 14 (App. Div. 1957).
This active course of juridical dispute was but symptomatic of the psychological unrest of those whose property rights thus were subjected to the discipline of the common need and it was, undoubtedly, in this state of mind that was written the somewhat vituperative missive, the alleged publication of which was the basis for the litigation resulting in the Law Division judgment challenged by this appeal. Specifically, the corporate and individual defendants-appellants seek to overthrow verdicts returned against them by a jury, for nominal compensatory damages in the case of the corporation, and for $750 in punitive damages against the individual defendant, in an action in which plaintiff-respondent *113 contended that by such publication he most cruelly had been defamed.
The events leading to the bruising and allegedly tortious comment upon the good name and fame of plaintiff-respondent were these:
The defendant-appellant, S.G. Holding Corp. (a closely held family corporation of which defendant-appellant Samuel Paris was president, in charge of its management and a major stockholder), had acquired, in July 1954, a large apartment house located in East Orange in Essex County, in an apartment in which plaintiff-respondent, Herman A. Fenning, resided. The rents being subject to control, the owner in May 1955 filed a well-documented application with the Essex County Rent Control Agency (N.J.S. 2A:42-23) for an increase in the rentals of all apartments including that of Fenning. The tenants, of whom there were 130, were unenthusiastic about this proposal and some of them engaged legal counsel to make known their demurrant views to the agency. The attorney for the landlord in those proceedings requested particularization of the grounds for such objections to the increase petitioned for, and Fenning furnished to his attorney a letter which he had prepared and had intended to file directly, in protest of the landlord's request for the rent increase. This document comprised a detailed and critical analysis of the factors upon which the application for increase was based, and on its face cut very deeply into the merits of the landlord's claims. Its factual statements (although almost polite when contrasted with the picturesque language in the letter in suit) were such that the publication of this document was made the subject of a counterclaim in the action for damages for libel. Before pretrial conference, however, this counterclaim had been dismissed on motion for summary judgment, apparently on the basis that no actionable publication in law was attributable to Fenning, who had merely furnished it to his attorneys, who then filed it, inter alia, in the proceeding thus pending before the agency. That such filing was compatible with that body's rules and practice is apparent by *114 reference to the formula under which the agency provided for notice and adversary procedure relative to such rent increases:

"RULES AND REGULATIONS OF ESSEX COUNTY RENT CONTROL AGENCY

Landlord's Application Essex County Rent Control Agency 1028 Broad Street Newark 2, New Jersey

Instructions to Landlord
1. Put your entire story in the blank space on the reverse side of this form. Put in grounds and reasons. Attach any supporting documents.
2. If application is for increase, state lawful rent and amount requested. And if it's a rooming house state the rents per day, week or month and the number of rooms and roomers.
If for decrease in space, services, etc. state what you wish to be decreased.
3. Serve on your tenant one copy of application and any attachments.
4. File with the Agency three copies of application at the above address, together with proof of service on tenant.
5. If your tenant makes an answer to your application, you have 7 days, if you desire, in which to reply. File two copies of your reply with the Agency Office, stating address of housing space.

Instructions to Tenant
If you want to answer your landlord's application, you must put all facts in letter form, serve a copy on the landlord and file your answer in duplicate with the Agency, all of which has to be done within 7 days. The papers filed with the Agency must include proof of service on the landlord and identify the housing space."
A significant effect of Fenning's powerful objection to the rent increase was that upon reading it, Paris took such umbrage that he dictated by phone, to a secretarial employee of his corporation, a letter addressed to Fenning and containing this caption:  "Re: Your reply to our schedule F-1 Apt. #503 South Munn Ave. East Orange, N.J." At the direction of Paris, this letter was not only mailed to Fenning but a copy sent for filing with the rent control *115 Agency. It contained the allegedly defamatory matter for which damages are sought.
Turning to the communication itself, we note that after its formal salutation and the notation of its relevancy to the dispute pending before the rent control Agency, it contains in its first paragraph a description of Fenning as "the ring leader and chief trouble maker for the previous landlord." From this comparatively restrained beginning the language becomes progressively warmer, soon rising to a pitch of literary incendiarism, including the application to Fenning of epithets such as "a plague and an abomination," "a parasite," a "Judas," a giver of "spurious testimony," a bearer of "false witness," and attributing to him conduct such as the making of "false charges, wilful, vile and mendacious inuendoes (sic) against us, from the slimy foul cesspool and abyss of your corruptible mind." By the "malevolent accusations" and "calumnious inferences" charged thereby, the writer plainly refers to the litigant role played by Fenning in connection with the filing of his protest with the Agency, since Paris therein tells Fenning that his "deliberate attempt to prejudice us in the eyes of the Rent Control authorities, fills us with loathing and contempt." In conclusion the writer, not surprisingly, confesses a lack of respect for Fenning, branding the latter as an undesirable tenant and urging his early departure from the scene, significantly exposing his chafing under the control restrictions by foreseeing the eventual time when "our property is confiscated from us."
As much as one might sympathize with the besieged landlord, it is also understandable that Fenning, scorched in the blast of this fiery eloquence and considering that his reputation thereby was rendered en brochette, at least in the estimation of those to whom it was published, instituted this suit for compensation therefor and to punish the author of the defamatory material.
In the cooler perspective of appellate review, we are bound to agree with the view of the learned trial judge that the letter was libelous per se, containing as it did *116 "* * * false defamatory words, written and published, injurious to the reputation of another or exposing him to hatred, contempt or ridicule or subjecting him to a loss of the good will and confidence entertained towards him by others * * *," the imputation of such words on their face being "* * * such as to raise the presumption of damage in the natural course, as a matter of law" (Leers v. Green, 24 N.J. 239 (1957)), even though it did not charge a crime as such. Garven v. Finch, 97 N.J.L. 329 (E. & A. 1922); Bock v. Plainfield Courier-News, 45 N.J. Super. 302 (App. Div. 1957); 33 Am. Jur., Libel and Slander, § 49. The plain import of the written words was that Fenning had and would, for unworthy and corrupt motives, offer false evidence to the rent control agency in support of baseless and spurious charges made against the appellants. A bearer of false witness, whether criminally perjurious or not, is regarded with loathing by just men.
Upon the basis of this classification of the defamatory words as libelous per se, the trial court controlled all issues of fact as to liability, submitting to the jury only the question of damages to be awarded the plaintiff. The appeal projects many of the legal questions to be expected in this type of litigation, including the status of dictation of libelous matter to a secretary, as publication (Ostrowe v. Lee, 256 N.Y. 36, 175 N.E. 505 (Ct. App. 1931)); the significance of such publication within the corporate frame (Bander v. Metropolitan Life Ins. Co., 313 Mass. 337, 47 N.E.2d 595 (Sup. Jud. Ct. 1943); Mims v. Metropolitan Life Ins. Co., 200 F.2d 800 (5 Cir. 1952)); the individual responsibility of Paris in view of his issuance of the letter as a corporate officer (Weinrib v. Ohmer Register Co., Inc., 122 N.J.L. 524 (Sup. Ct. 1939); Pennington Trap Rock Co. v. Pennington Quarry Co., 22 N.J. Misc. 318 (Sup. Ct. 1944); Hirsch v. Phily, 4 N.J. 408 (1950); Sensale v. Applikon Dyeing & Printing Corp., 12 N.J. Super. 171 (App. Div. 1951)); whether the letter was qualifiedly privileged such as to create a jury issue as to malice or good faith (Jorgensen v. Pennsylvania Railroad Co., 38 N.J. Super. 317 (App. Div. 1955)); *117 and, the asserted irreconcilability of the verdicts punishing Paris by the award against him of exemplary damages, but not granting compensatory damages against him (Walsh v. Trenton Times, Inc., 124 N.J.L. 23 (E. & A. 1940); Money v. Etter, 8 N.J. Super. 371 (Law Div. 1950)).
We must reject the temptation to explore these interesting bypaths of the law, in the face of the controlling rule as to absolute privilege as recently discussed by our Supreme Court in the case of Rainier's Dairies v. Raritan Valley Farms, Inc., 19 N.J. 552 (1955). The doctrine that an absolute immunity exists in respect of statements, even those defamatory and malicious, made in the course of proceedings before a court of justice, and having some relation thereto, is a principle firmly established (LaPorta v. Leonard, 88 N.J.L. 663 (E. & A. 1916); Rogers v. Thompson, 89 N.J.L. 639 (E. & A. 1916); Kantor v. Kessler, 132 N.J.L. 336 (E. & A. 1945)), and is responsive to the supervening public policy that persons in such circumstances be permitted to speak and write freely without the restraint of fear of an ensuing defamation action, this sense of freedom being indispensable to the due administration of justice. Cf. O'Regan v. Schermerhorn, 25 N.J. Misc. 1 (Sup. Ct. 1946). It is commonly considered that such privilege, for the same policy considerations, extends to quasi-judicial proceedings before a tribunal recognized by law which, though not a court in the ordinary sense, exercises judicial functions, that is to say, acts in a manner similar to that in which a court acts in respect of an inquiry before it. Gatley, Libel and Slander (4th ed.), p. 181. The absolute privilege extends no further in this area, and defamatory statements, though relevant, made to other officers or bodies acting, though officially, other than in a quasi-judicial proceeding, for instance, revert to a status of qualified privilege, a much lesser form of immunity, usually inducing a jury issue as to elements of malice, reasonable cause, good faith and the like. Finkelstein v. Geismar, 91 N.J.L. 46 (Sup. Ct. 1917), affirmed 92 N.J.L. 251 (E. & A. 1918); Licciardi v. Molnar, 23 N.J. Misc. 361 (D. Ct. 1945); *118 Smith v. National Meter Co., [1945] K.B. 543; Jorgensen v. Pennsylvania Railroad Co., supra; Murphy v. Johns-Manville Products Corp., 45 N.J. Super. 478 (App. Div. 1957).
As in most other United States jurisdictions (33 Am. Jur., supra, § 146) the broad protection of the English rule, according absolute privilege to statements made in the course of judicial proceedings, although the words were written or spoken maliciously, without any justification or excuse, and from personal ill will or anger against the party defamed (Munster v. Lamb, [1883] 11 Q.B.D. 588; Royal Aquarium v. Parkinson, [1892] 1 Q.B., at p. 431; O'Connor v. Waldron (1935) 1 D.L.R. 260, (1935) A.C. 76, P.C.) was diluted in New Jersey by excluding from the privilege defamatory statements made in the course of such proceedings, but not relevant thereto. LaPorta v. Leonard, supra. The pertinency thus required is not a technical legal relevancy, such as would, necessarily, justify insertion of the matter in a pleading or its admission into evidence, but rather a general frame of reference and relationship to the subject matter of the action. Johnston v. Schlarb, 7 Wash.2d 528, 110 P.2d 190, 134 A.L.R. 474. As to the degree of relevance needed to invoke the absolute shield of this immunity, the courts are most liberal, for the same reasons that the jurisdiction of the tribunal is not weighed with technical precision, but need only be colorable, i.e., an assumed authority to act under law (O'Regan v. Schermerhorn, supra), for otherwise the speaker or writer would have to decide the question of jurisdiction at his peril, and the sweep of the privilege would be inhibited at the cost of the policy considerations which give it life. Rainier's Dairies v. Raritan Valley Farms, Inc., supra.
Our concept of the factual situation here seems to bring it within these principles. As to the forum, it existed under the valid rent control legislation hereinbefore referred to; as to the proceeding, it fell within the color of jurisdiction vested by the statute:
*119 "A county rent control agency, * * * may upon an application by the landlord, on notice to the tenant, and upon a hearing and determination as provided under this act, grant a rent increase * * *." (N.J.S. 2A:42-29);
as to the disputants, they were parties to this adversary proceeding, as is obvious; as to the defamatory letter, it was, while permissively filed, clearly within the framework of informal pleading matter encompassed by the practice of the agency (see paragraph 5 of Instructions to Landlord, supra), inasmuch as it was aimed at the credibility and force of the protestations which Fenning had levelled at the rent increase; however defamatory and infantile, therefore, it fell within the broad relationship of relevance heretofore described. We are thus forced to the conclusion that its publication to the rent control agency was absolutely privileged, and this privilege extended as well to make nonactionable the incidental and necessary publication to the stenographer to whom it was dictated, for the absolutism of the privilege would be ineffective were it not to extend to one who thus mechanically, transcribes the privileged material. This determination does not involve the asserted rule (Ostrowe v. Lee, supra) that dictation to a secretary is a publication (which question we need not consider and do not rule upon), but merely holds that the absolute privilege embraces the incidents necessary to its enjoyment, for otherwise, in modern concept at least, it would be destroyed. Odgers, Libel and Slander (6th ed.), p. 247.
Here, as in the case of the Office of Milk Industry involved in the Rainier's case, supra, the statutory formula contemplated an administrative proceeding actually conducted in the manner, and with safeguards similar to those of a judicial proceeding, including notice, informal pleading and hearing, and as in that case, such litigation dealt with "issues of significant public concern," for it cannot be doubted that rent control realistically falls into that category. It follows, borrowing the sense of the language of the learned writer of that opinion, that administrative agencies such as the Essex County Rent Control Agency and the Office of Milk Industry *120 "are now a vital part of American life and perform important public duties; it seems only just that, to the extent they discharge a function comparable to the judicial function, they and the participants in the proceedings before them be vested with a comparable privilege or immunity." Rainier's Dairies v. Raritan Valley Farms, Inc., supra.
On the factual pattern displayed to us on this appeal, an absolute privilege attached as a matter of law, and all vestige of a cause of action is consumed in the necessary supremacy of the rule of public policy which we have discussed.
The judgment is reversed, and the issue remanded to the Law Division for entry of judgment for defendants-appellants.