877 A.2d 277 (2005)
379 N.J. Super. 118
Carol Gorga WILLIAMS, Plaintiff-Appellant,
v.
Linda B. KENNEY and Robert L. Tarver, Jr., Defendants-Respondents.
Superior Court of New Jersey, Appellate Division.
Argued May 2, 2005.
Decided July 8, 2005.
*280 Richard A. Ragsdale, Princeton, argued the cause for appellant (Carchman, Sochor, Schwartz, Ragsdale & Cohen, attorneys; Mr. Ragsdale, on the brief).
Michael J. Canning, Middletown, argued the cause for respondent Linda B. Kenney (Giordano, Halleran & Ciesla, attorneys; Mr. Canning, on the brief).
Bruce S. Rosen, Chatham, argued the cause for respondent Robert L. Tarver, Jr. (McCusker, Anselmi, Rosen, Carvelli & Walsh, attorneys; Mr. Rosen and Anilkumar R. Avutu, Florham Park, on the brief).
Before Judges CUFF, HOENS and KING.
The opinion of the court was delivered by
KING, P.J.A.D. (Retired and temporarily assigned on recall).
This case involves the scope of the absolute litigation privilege. We conclude that the Law Division judge's decision exceeded the scope of this absolute privilege in absolving an attorney and her client from liability to a newspaper reporter. We affirm in part, reverse in part and remand for further proceedings.

I
Plaintiff is a newspaper reporter who sued for defamation based on a letter sent by defendant Linda B. Kenney, an attorney, to plaintiff's employer. At the time Kenney sent the letter, she was representing defendant Robert L. Tarver, Jr., in litigation against his employer, the New Jersey Office of the Public Defender (OPD). Kenney claims that this letter was protected by the absolute litigation privilege because she sent it in the course of and in furtherance of Tarver's lawsuit and it was related to that proceeding. The Law Division judge agreed and dismissed the action. The judge rejected Kenney's alternative claim that the letter was sent in contemplation of litigation against plaintiff and her employer, the Asbury Park Press.

II
This is the procedural context. On January 9, 2003 plaintiff Carol Gorga Williams filed a complaint in Superior Court, Law Division, Monmouth County against defendants Linda B. Kenney and Robert L. Tarver, Jr. She alleged private-figure defamation (based on negligence), public-figure defamation (based on actual malice), false-light invasion of privacy, and intentional infliction of emotional distress. The defendants asserted the absolute litigation privilege as a defense.
Plaintiff moved to strike this defense as a matter of law. Both defendants then cross-moved for summary judgment based on the applicability of the litigation privilege. The motion judge granted defendants' motions for summary judgment and dismissed the complaint.

III
On July 27, 2001 plaintiff, a courthouse reporter for the Asbury Park Press, wrote an article about defendant Tarver, the head of the Ocean County Public Defender's office. She reported allegations made against Tarver for falsification of time records to conceal the extent of his outside employment as a television commentator. The article contained references to Gerald Boswell, an attorney in the Ocean County *281 Public Defender's office, who had initiated the complaint. Plaintiff reported that the authorities were investigating the allegations.
Tarver believed the article was deceptive, biased and defamatory, especially because it ignored facts adverse to Boswell. Tarver concluded that the OPD was trying to defame him and attack his character in retaliation for complaints he had made to OPD "management" about Boswell. Tarver had considered suing both plaintiff and the Asbury Park Press but never did; he had hoped they would correct their errors.
On July 31, 2001 Tarver spoke by phone to Peter Garcia, then the acting head of the OPD. Tarver decided to tape the conversation because he suspected that OPD management had not been supporting him. During the course of this conversation, Garcia told Tarver that he was "gonna be okay" and that the investigation was "gonna go away" and be "wrapped up by Friday" if Tarver "just lay low." Garcia admitted that if he hurt Tarver, it would look bad for Garcia, as well.
Garcia also told Tarver that "all this shit that's coming out in the paper, I found out who's doing that"  "Boswell, through that girl, Carol. He's been porking for years." According to Garcia, when Tarver was cleared by Garcia's office, then Tarver could "do whatever you want against that newspaper." That is, when Tarver got his "nice little memo" saying he did not do anything wrong "other than maybe forget to update your, your outside employment, ... you can go after that newspaper, okay." Garcia's suspicion that Boswell was the source of the leak to the newspaper and that Boswell was in an intimate relationship with the reporter, coupled with Garcia's failure to take any disciplinary action against Boswell, led Tarver to believe that Garcia tacitly approved of the newspaper article.
In August 2001, the Asbury Park Press published another article written by plaintiff. This article included references to Boswell and to statements made by defendant Kenney, an attorney, in defense of Tarver. Although Tarver again contemplated suing plaintiff and her paper, he held off because of the ongoing investigation against him and his belief that he would ultimately be vindicated.
Lucas E. Phillips, Jr., an attorney, confirmed that Tarver first contacted him in August 2001 regarding the viability of a defamation action against plaintiff and the newspaper. Their conversations continued through January 2002. Phillips advised Tarver that he had a viable claim. Defendant Kenney, who had been retained by Tarver on July 27, 2001 in his dispute with the OPD, explained that since she was a paid columnist for the Asbury Park Press, she would not take clients who wanted to sue the newspaper.
Tarver believed that the leaks to the newspaper were part of a pattern of defamatory conduct by his employer, the OPD. At the time, he thought there could be a conspiracy among State officials, Boswell, and plaintiff. Specifically, he thought that the OPD was using Boswell's relationship with plaintiff to spread inaccurate information about him.
On December 13, 2001 Kenney filed a civil complaint on behalf of Tarver against the State of New Jersey, Office of the Public Defender. The complaint described Tarver's assertions against Boswell. It asserted claims of racial discrimination and retaliation under state statutes and the State Constitution but did not include any defamation claims.
The first newspaper article about Tarver's lawsuit appeared in the Asbury Park Press a month later, on January 12, 2002, after the newspaper learned of the *282 suit from the New Jersey Law Journal. On January 10, 2002, two days before this article was published, an Executive Summary of the Public Defender's Management Audit of the Ocean Regional Office had concluded that Tarver was involved in serious mismanagement, conversion of his employer's time and resources, and contempt. The report recommended that Tarver's ethical violations be forwarded to the State's Executive Commission on State Ethical Standards.
The January 12 article, written by plaintiff, reported that the OPD had substantiated the allegations against Tarver regarding the improperly prepared "time sheets" and that the matter had been referred to State ethics officials. The article also mentioned Tarver's suit and his allegations against Boswell. According to Tarver, the article was biased because it did not cast him as a victim of discrimination and demonstrated plaintiff's hesitancy to criticize Boswell.
On January 14, 2002 Kenney filed an amended complaint on Tarver's behalf, adding Garcia as a defendant. The amended complaint alleged that the OPD had submitted an unfounded report filled with misrepresentations which failed to mention that Garcia thought the allegations against Tarver were false. According to this amended complaint:
During this period of time, leaks occurred from the Public Defender's Office resulting in a front page article in the Asbury Park Press and an article in the Press of Atlantic City damaging Mr. Tarver's reputation wherein the Office of the Public Defender failed to report the true facts concerning the employment situation of Mr. Tarver, leading the public to believe that he was somehow associated with criminal activity. Furthermore, the Office of the Public Defender by its agents, heirs, assigns, and John Doe supervisors, continued to participate in the attacks upon Mr. Tarver which are motivated by the illegal animus set forth in this complaint, by failing to take disciplinary action against those who would have planted such a story. Mr. Garcia has admitted to Mr. Tarver that Mr. Boswell was the leak and has taken no action against him.
Kenney attached to the amended complaint a copy of the transcript of the phone conversation between Tarver and Garcia. The amended complaint in referring to this transcript was redacted to delete the reference to plaintiff's name "Carol."
Kenney claimed that she redacted plaintiff's name because the sexual relationship between plaintiff and Boswell to which Garcia had alluded "was not an important proof in Tarver's claims against the defendant in the Discrimination Lawsuit."
On January 15, 2002 another article written by plaintiff was published in the Asbury Park Press. The article spoke of Tarver's suit and of the possibility that Boswell might also sue if the State settled its case with Tarver. Kenney then considered adding the plaintiff and the newspaper as defendants in Tarver's lawsuit against the State and alleging claims for defamation, false-light invasion of privacy, and conspiracy.
Tarver also believed that Garcia's allegation of a relationship between plaintiff and Boswell should be investigated to solidify his claims against the State. That is, in order to protect himself in his upcoming litigation with the State, Tarver thought he needed to prove that the articles written by plaintiff were false. Short of his filing suit against plaintiff and the Asbury Park Press, he thought that only the newspaper could investigate Garcia's allegation.
On January 16, 2002 Kenney faxed a letter to Fred Simmonds, the Ocean County *283 editor of the Asbury Park Press. An employee at the newspaper's office took this letter, the basis for plaintiff's defamation complaint, from the fax machine and placed it on Simmonds' desk.
The subject of the letter was "Press Conference Scheduled for Thursday, January 17, 2002 at 11:30 a.m." in Tarver v. State of New Jersey. The letter to Simmonds stated:
I am writing to you, which ordinarily I would not do, but as a columnist for the Asbury Park Press, I feel a responsibility to both you and my client. Mr. Tarver and I understand the NAACP and other minority leaders are extremely upset with the coverage by the Asbury Park Press on the above-captioned matter. For instance, when Mr. Tarver filed his Complaint against the State of New Jersey, not a word was mentioned, compared to the article from the New Jersey Law Journal attached hereto. In fact, we were informed that the reporter covering the matter for the Press was not going to do an article until the report concerning Mr. Tarver came out and that persons within the Public Defender's Office had been told it would be slanted to favor them. I cannot pass on the truth of the hearsay but I only mention it to you.
The reason why I am writing this letter, is because tomorrow, Mr. Tarver is having a press conference (see attached notice). At the press conference, a redacted portion of a transcript, which will have already been filed in Court this week, will be released. I am giving a copy of this to you in advance and ask that you not print this until after the press conference tomorrow. I am also giving you a copy of the unredacted transcript because it indicates from Peter Garcia himself that one of the players in this matter may have a personal relationship with your reporter covering the matter (see transcript at page 4). The transcript is an attached exhibit to the First Amended Complaint filed in this matter.
We have redacted the transcript for obvious reasons but I bring [it] to your attention because you may wish to investigate whether or not the coverage in this matter has in any way been incomplete because of this allegation by Peter Garcia, himself, not us. Therefore, I bring it to your attention to do with it as you see fit.
If you have any questions, please do not hesitate to contact me. I will be available to speak with you tonight at home... or early tomorrow morning on my cell phone ... if you wish to discuss this further.
[Emphasis added.]
The notice of the press conference was in the form of a "Media Advisory" titled "Former Ocean County Public Defender to Rebut State Investigation." Tarver was the "former" Ocean County Public Defender at this point; after the Executive Summary findings against him, he was temporarily reassigned to a regional office for management training purposes. Joining Tarver at the press conference were Kenney, Reverend Arnold Evans, the pastor of a church in South Toms River, Saleem Abdullah, the president of the Toms River branch of the NAACP, and Walter Fields, former political director for the New Jersey NAACP. The notice was sent to the local press and television media. At the press conference the following day, a "heavily edited" copy of the transcript apparently was produced.
Fields had advised Kenney to schedule the press conference to respond to the "slanted" news stories. According to Fields, there was a slant in the coverage: it appeared that plaintiff's articles were *284 written with the help of someone inside the local Public Defender's office. Fields wanted to challenge plaintiff regarding the accuracy of her stories, which he thought were prepared for the sole purpose of assassinating Tarver's character.
Also on January 16, 2002 Abdullah and James Waters, the president of the Ocean County NAACP, faxed a letter to Ray Ollwerther, the executive editor of the Asbury Park Press. The letter was dated January 15 and was addressed to both Ollwerther and Simmonds. On the cover sheet to the fax transmission, Waters had handwritten: "IT'S VERY IMPORTANT TO REPORT BOTH SIDES OF AN ISSUE." The body of the letter outlined the various ways in which the newspaper had failed to provide a fair and balanced coverage of Tarver's story and had refused to publish anything that would put Boswell in a bad light. It stated in part:
Perhaps the reporter who covers this matter is too closely related to Mr. Boswell to have an objective outlook. We note that this is the same reporter who did a front page article on Mr. Boswell several years ago on his impending retirement. It now seems that Mr. Boswell is able to use the Asbury Park Press to wreak havoc through this reporter who is willing to serve as his mouthpiece.
Unfortunately, journalistic integrity is suffering because of this alliance.
Simmonds read Kenney's letter as raising only the allegation that she did not like the coverage of her client. He did not understand the letter to be raising an allegation of sexual impropriety by plaintiff. Simmonds gave the letter to Gary Deckelnick, the legal affairs editor. Deckelnick later told Simmonds what was actually alleged, and Simmonds expressed surprise. For his part, Boswell claimed that he had not been the source of plaintiff's stories. He admitted, however, that plaintiff clearly had a source in the Public Defender's office and he mentioned a different staff attorney as the likely tipster.
A meeting was called at the Asbury Park Press office the same day the letter of January 16 was received. Plaintiff, Ollwerther, Deckelnick, and Harry Ziegler attended. Ollwerther did not understand the letter as a threat to sue either the newspaper or plaintiff. Plaintiff was removed from the Tarver story. This upset her. Although there was a discussion as to whether Kenney should continue her column with the newspaper, the decision was made to allow her to continue.
The next article about Tarver in the Asbury Park Press was published on January 18, 2002. It was written by a reporter other than plaintiff and dealt with Tarver's rebutting the ethics claims against him.
In relying on the defense of the litigation privilege, Kenney certified that her letter was written "for the sole purpose of protecting the interests of my client, Mr. Tarver, to prevent further unfair and defamatory reporting and to mitigate any further damage to the reputation of Mr. Tarver." Kenney believed an allegation of a sexual relationship between plaintiff and Boswell was "absolutely" relevant to Tarver's lawsuit against the State because this showed everything "they have read about this guy is simply untrue." That is, the allegation was relevant to Tarver's credibility and would show that he was not the "bad guy" here, but instead was a victim. Kenney also asserted that the transcript of the phone conversation between Tarver and Garcia would not have been redacted if it had been presented to a jury in the Tarver case. She also claimed the letter was privileged because it was written "preliminary to and in contemplation of a legal action against plaintiff and the Press, to instigate an investigation into and to prevent *285 continued unfair reporting of the Tarver Investigation and Discrimination Lawsuit, to prevent further damage to the reputation of Mr. Tarver and to secure justice for him."
Kenney claimed that she delivered an unredacted copy of the Garcia transcript to Simmonds so that he would know of the breach of journalistic integrity by plaintiff and conduct an appropriate investigation "in order to assure that there would be no more unfair and defamatory reporting of Tarver." Kenney asserted Tarver's reputation would continue to be damaged unless an appropriate investigation was undertaken. To Kenney, it was also "patently clear" that Tarver had a viable claim for defamation against plaintiff and the newspaper.

IV
In ruling that the litigation privilege applied, the Law Division judge observed that Tarver had settled his discrimination lawsuit against the State and Garcia for $150,000 and that all disciplinary charges against Tarver had been dropped. On this appeal, plaintiff claims that Boswell later brought suit against Tarver, Garcia, the OPD, and others, alleging retaliation, reverse discrimination, and defamation. The status of that litigation is unknown to us. With respect to the letter of January 16, plaintiff alleged two defamatory statements: (1) that she was having a sexual relationship with Boswell and (2) that her next report would be slanted in favor of the OPD.
For purposes of the summary judgment motion only, the judge accepted the claims that the transcript of the telephone conversation between Garcia and Tarver contained false statements of fact and that Kenney and Tarver had republished these statements when Kenney, on Tarver's behalf, sent the letter of January 16 to the Asbury Park Press. The judge also assumed that the January 16 letter contained misstatements. Defendants possibly could be exposed to liability for these statements and for their republication, unless the absolute litigation privilege applies.
The judge observed that the privilege provides absolute immunity for defamatory statements made in the course of judicial proceedings by litigants to achieve an object of the litigation which had some connection or logical relation to the litigation. With respect to the transcript of the telephone conversation, the judge noted plaintiff contended only that defendants failed to establish the object they sought to achieve had any logical relation to the Tarver litigation.
According to the judge, the logical relation requirement meant only a general frame of reference in relation to the subject matter of the lawsuit, and not a technical or legal relevancy. Matters to which the privilege did not extend, he reasoned, must be so lacking in relation to the subject matter of the litigation that no reasonable person could entertain relevancy.
Here, Tarver had alleged in his lawsuit that the State was conspiring to defame him. His claim against the State and Garcia would have been supported if he could show that Garcia knew about the relationship between Boswell and plaintiff and about the leaks of information, but yet failed to take any action against Boswell. Hence, the judge concluded that the litigation privilege applied with respect to the transcript sent by defendants to the newspaper.
The judge held that the absolute litigation privilege could also protect an attorney against statements made in a pre-litigation letter. That is, the privilege extends to preliminary conversations and interviews between a prospective witness *286 and an attorney if they are in some way related to or connected with a pending or contemplated legal action. Generally, communications occurring preliminary to or in preparation for proposed proceedings are privileged.
However, the judge did not find that the letter at issue in this case was such a pre-litigation communication in contemplation of a possible action against plaintiff and the Asbury Park Press for defamation. Such a communication must show a clear and unambiguous intention to inform the recipient of possible future legal action. Here, the judge thought the subject of the letter was Tarver's lawsuit against the State, not a potential lawsuit against plaintiff and the newspaper. Moreover, Kenney had not been retained by Tarver to sue plaintiff and the Asbury Park Press. Tarver had consulted with another attorney for that purpose. Kenney herself admitted that she would not have sued the Asbury Park Press on Tarver's behalf because of her own relationship with that paper as a columnist.
The judge found that the January 16 letter was absolutely privileged because it was sent in furtherance of and in relation to the ongoing Tarver litigation, for the purpose of achieving success in prosecuting the litigation. That is, Tarver had the right and Kenney had the duty to find out whether there was any validity to Garcia's allegation which, if true, would strengthen Tarver's suit against the State and Garcia. Part of an attorney's duty in the course of ongoing litigation, the judge reasoned, is to protect the client's reputation, especially when the client is a public official. The fact the letter was also intended to stop plaintiff from writing about Tarver in a negative light did not detract from its asserted publication in the course of judicial proceedings to achieve the objective of the lawsuit.
The judge granted defendants' motions for summary judgment. He also dismissed the ancillary claims alleged in the complaint because the litigation privilege also barred these derivative tort actions.

V
Plaintiff first contends that the judge erred in applying the litigation privilege because defendants failed to show that their statements were made "in furtherance of" the Tarver litigation or "in the course of" that judicial proceeding. She asserts that the privilege should not be extended to extra-judicial efforts by lawyers to protect their client's reputation. Defendants reply that they satisfied all of the requirements of the litigation privilege.
We see this as a close question. Is mere general or tangential subject matter relevance enough? Or must there be some more substantial relevance for the absolute privilege to prevail?
A statement made in the course of a judicial proceeding is absolutely privileged and wholly immune from liability. Hawkins v. Harris, 141 N.J. 207, 213, 661 A.2d 284 (1995); Erickson v. Marsh & McLennan Co., Inc., 117 N.J. 539, 563, 569 A.2d 793 (1990); Peterson v. Ballard, 292 N.J.Super. 575, 581, 679 A.2d 657 (App. Div.), certif. denied, 147 N.J. 260, 686 A.2d 761 (1996); Ruberton v. Gabage, 280 N.J.Super. 125, 132, 654 A.2d 1002 (App. Div.), certif. denied, 142 N.J. 451, 663 A.2d 1358 (1995). This immunity "is predicated on the need for unfettered expression critical to advancing the underlying government interest at stake in those settings." Hawkins, 141 N.J. at 213, 661 A.2d 284. The privilege is responsive to the public policy that jurors, witnesses, parties, and their representatives be permitted to speak and write freely without fear of liability. Id. at 214, 661 A.2d 284; Fenning *287 v. S.G. Holding Corp., 47 N.J.Super. 110, 117, 135 A.2d 346 (App.Div.1957); Devlin v. Greiner, 147 N.J.Super. 446, 455, 371 A.2d 380 (Law Div.1977). This absolute privilege applies "even if the words are spoken maliciously, without any justification or excuse, and from personal ill will or anger[.]" DeVivo v. Ascher, 228 N.J.Super. 453, 457, 550 A.2d 163 (App. Div.1988) (citing Fenning, 47 N.J.Super. at 118, 135 A.2d 346), certif. denied, 114 N.J. 482, 555 A.2d 607 (1989).
The privilege applies to "any communication (1) made in judicial or quasi-judicial proceedings; (2) by litigants or other participants authorized by law; (3) to achieve the objects of the litigation; and (4) that have some connection or logical relation to the action." Hawkins, 141 N.J. at 216, 661 A.2d 284 (quoting Silberg v. Anderson, 50 Cal.3d 205, 266 Cal.Rptr. 638, 786 P.2d 365, 369 (1990)). Whether the privilege applies is a question of law for the court to decide. Hawkins, 141 N.J. at 216, 661 A.2d 284 (citing Devlin, 147 N.J.Super. at 460, 371 A.2d 380). The only element not disputed here was the second. That is, Tarver, as the party to the underlying lawsuit, and Kenney, as his attorney, are clearly the very parties whom the privilege seeks to protect.
With respect to the first element, the privilege clearly applies to all statements made "in connection with" a judicial proceeding, including settlement negotiations and private conferences; it is not limited to statements made under oath. Hawkins, 141 N.J. at 216, 661 A.2d 284; Dello Russo v. Nagel, 358 N.J.Super. 254, 266, 817 A.2d 426 (App.Div.2003); Peterson, 292 N.J.Super. at 581, 679 A.2d 657; Ruberton, 280 N.J.Super. at 133, 654 A.2d 1002; DeVivo, 228 N.J.Super. at 457-58, 550 A.2d 163. Limiting the privilege to in-court proceedings would inhibit potential witnesses from coming forward, impede the ability of litigants to engage in discovery and investigation, and encumber settlement negotiations. DeVivo, 228 N.J.Super. at 458-59, 550 A.2d 163.
The privilege should not extend, however, "to statements made in situations for which there are no safeguards against abuse." Hawkins, 141 N.J. at 221, 661 A.2d 284 (quoting Demopolis v. Peoples Nat. Bank of Washington, 59 Wash.App. 105, 796 P.2d 426, 430 (1990)). "The potential harm which may result from [the] absolute privilege is mitigated by the comprehensive control of the trial judge over judicial proceedings and the rules of professional conduct which govern attorney conduct." Peterson, 292 N.J.Super. at 588, 679 A.2d 657 (citing Hawkins, 141 N.J. at 207, 661 A.2d 284).
Hence, we have said that "extra-judicial distribution of papers filed in court" is not ordinarily deemed privileged because "[s]uch publications are made beyond the controls and inhibitions inherent in the judicial process." Citizens State Bank of N.J. v. Libertelli, 215 N.J.Super. 190, 197-98, 521 A.2d 867 (App.Div.1987). "Immunity does not extend to statements published outside of a judicial proceeding to persons not connected with it." Id. at 198, 521 A.2d 867. Otherwise, a person could file defamatory statements in a judicial proceeding with impunity "and then proceed to republish [them] at will under the cloak of immunity." Ibid.; DeVivo, 228 N.J.Super. at 461-62, 550 A.2d 163.
In particular, distribution of court-filed documents to the press is not protected because
such distribution ... is foreign to the purposes of the privilege and serves only the interest of the distributor in getting one side of the story out first or most vividly.... Distribution to the press and public of pleadings and other documents *288 may be a tactic chosen by litigators, but it is not immunized as a part of the judicial process.
[Citizens State Bank of N.J., 215 N.J.Super. at 199, 521 A.2d 867.]
Communications made to newspapers and during press conferences "have been almost universally found to be excluded from the protection of absolute privilege." DeVivo, 228 N.J.Super. at 462, 550 A.2d 163 (citing Asay v. Hallmark Cards, 594 F.2d 692, 698 (8th Cir.1979)). See Rothman v. Jackson, 49 Cal.App.4th 1134, 57 Cal.Rptr.2d 284, 294-95 (1996) (although privilege should not be extended to "litigation in the press," there might be circumstances where a newspaper publisher is a participant, in litigation). Hence, in deciding whether to immunize publications made to the news media, we must look to see if the content, manner, and recipient of the extra-judicial communications bear any relation to the judicial proceeding. Green Acres Trust v. London, 141 Ariz. 609, 688 P.2d 617, 622 (1984); see Jones v. Clinton, 974 F.Supp. 712, 731 (E.D.Ark.1997) (there is no absolute privilege to make defamatory statements to news media when the media is unconnected to judicial proceeding), appeal dismissed, 161 F.3d 528 (8th Cir.1998).
This brings us to the third and fourth requirements of the litigation privilege. The requirement that the communication be in furtherance of the objectives of the litigation is part and parcel of the requirement that the communication have some logical relation to the action. Silberg, 266 Cal.Rptr. 638, 786 P.2d at 374; see Hawkins, 141 N.J. at 218, 661 A.2d 284 (whether statements were made to achieve objects of litigation may depend on their relationship to litigation).
With respect to relevancy, "the question is whether the ... statements at issue were in any way relevant to the proceedings." Hawkins, 141 N.J. at 218-19, 661 A.2d 284. "The pertinency thus required is not a technical legal relevancy,... but rather a general frame of reference and relationship to the subject matter of the action." Id. at 218, 661 A.2d 284 (quoting Fenning, 47 N.J.Super. at 118, 135 A.2d 346).
We may be indulgent in favor of relevancy or pertinency. Thourot v. Hartnett, 56 N.J.Super. 306, 309, 152 A.2d 858 (App.Div.1959). The burden of proving otherwise is on the party seeking to show that the statements were not privileged. Ibid. Also, we realize that "courts [should] not make paper-fine distinctions when analyzing whether a potentially privileged statement `relates' to a judicial proceeding." Kanengiser v. Kanengiser, 248 N.J.Super. 318, 337, 590 A.2d 1223 (Law Div.1991).
Relevancy usually is interpreted liberally so that the speaker does not act "at his peril." DeVivo, 228 N.J.Super. at 460-61, 550 A.2d 163; Fenning, 47 N.J.Super. at 118, 135 A.2d 346 (citing Rainier's Dairies v. Raritan Valley Farms, Inc., 19 N.J. 552, 117 A.2d 889 (1955)). The privilege should not apply to matter that is "so wanting in relation to the subject matter of controversy as that no reasonable man can doubt its irrelevancy and impropriety." DeVivo, 228 N.J.Super. at 460, 550 A.2d 163 (quoting Thourot, 56 N.J.Super. at 308, 152 A.2d 858). Neither the relevancy requirement nor the "in furtherance of" requirement is intended "as a test of the speaker's motives, morals, ethics, or intent." Hawkins, 141 N.J. at 218, 661 A.2d 284 (quoting Silberg, 266 Cal.Rptr. 638, 786 P.2d at 374).
As we have stated, applying these principles to the case before us presents a very close question. Defendants contend *289 that this was not a case where they reported statements to "the press" solely to protect their client's reputation in ongoing litigation or to engage in public "mudslinging." Rather, they claim that the Asbury Park Press was very much a part of Tarver's litigation against the State because representatives of the Public Defender's office had conspired with plaintiff, a reporter for that newspaper, to tarnish Tarver's reputation. Whether plaintiff had an intimate relationship with one of the Public Defender's representatives, they assert, was presumptively relevant to the litigation, and communication of that relationship solely to plaintiff's editor was intended to achieve the objectives of the litigation.
Defendant Kenney urges that, in the course of the Tarver litigation, she could have deposed plaintiff's editor, shown him an unredacted transcript of the Garcia phone conversation, and questioned him regarding plaintiff's bias as a result of her alleged sexual relationship with Boswell. Defendant Kenney argues, and properly so, that this conduct would have been protected by the litigation privilege. She asserts she should not lose this privilege merely because she "initially sought to obtain answers to these inquiries through a letter rather than through a formal deposition." She also contends that plaintiff's editor was in the best position to conduct the requested inquiry into Garcia's allegation.
Defendants' contentions have a certain facial allure, especially under the liberality with which the relevancy requirement is interpreted for purposes of the litigation privilege. Nevertheless, there are flaws. Mere tenuous subject matter relevance to the litigation is not enough. Kenney's own certified and sworn statements, submitted during the course of this litigation, belie her assertion that she did not send the letter simply to protect her client's reputation. For example, Kenney admitted that:
 her "sole purpose" in writing the letter to the newspaper was to prevent further unfair and defamatory reporting and to mitigate further damage to Tarver's reputation;
 she redacted the transcript attached to the amended complaint because she did not think plaintiff's name was relevant to the issues in that complaint and because the relationship between plaintiff and Boswell "was not an important proof in Tarver's claims against defendants in the Discrimination Lawsuit";
 the sexual relationship was relevant to show that Tarver was a victim and that the stories written about him were untrue;
 Garcia's allegation about the relationship was important to show that plaintiff's journalistic integrity may have been compromised and that journalistic principles were being violated; and
 Kenney delivered an unredacted transcript to plaintiff's editor "in order to assure that there would be no more unfair and defamatory reporting" of Tarver.
In our view, these admissions by Kenney sound very much like an attorney who is opportunistically litigating her client's case in the press. Indeed, the fact that Kenney planned to hold a press conference the following day for this very purpose supports this view. Extra-judicial statements relating to a party's honesty or credibility are usually not sufficiently relevant to clothe them with an absolute privilege. Hawkins, 141 N.J. at 219, 661 A.2d 284.
Defendants rely on Thomas v. Ford Motor Co., 137 F.Supp.2d 575, 577 (D.N.J. 2001), a case in which the plaintiff had sued for the wrongful death of his wife *290 resulting from the improper activation of airbags in a vehicle manufactured by Ford Motor. During the course of the litigation, Ford Motor developed a theory that the plaintiff himself had caused his wife's death intentionally. Ford Motor contacted the local prosecutor, the police, and the medical examiner to persuade them that the plaintiff had killed his wife. Id. at 578.
The federal district court judge ruled that these communications took place in the context of ongoing litigation and that, as long as the plaintiff's murder of his wife was part of the defense, it did not matter that the defendant's sole purpose in making these statements to third parties was to instigate a criminal investigation. Id. at 585. The statements sought to achieve the litigation objective of securing a finding that the defendant was not liable for the injury that the plaintiff alleged was caused by a defective airbag. Id. at 585-86.
The defendant's statements in Thomas regarding other causes of the decedent's injury were related to the underlying products liability action. Here, in the case before us, we fail to see how Kenney's statements regarding plaintiff's bias in performing her job as a reporter had anything to do with Tarver's racial discrimination and retaliation complaints against his employer. Defendants' argument overlooks the fact that, even if the relationship between Boswell and plaintiff was relevant in some way to the Tarver litigation, the extra-judicial communication of that information to plaintiff's employer did not appear to serve any purpose other than to encourage the newspaper to stop printing its allegedly biased stories about Tarver. Although arguably there was a conditional privilege that applied here to defendants' communication to plaintiff's employer, Erickson, 117 N.J. at 563, 569 A.2d 793 (communication made bona fide upon subject matter in which parties have corresponding interest or duty), such a privilege would have been qualified only and would not require dismissal of the complaint. Also unpersuasive is defendant's reliance on DeVivo, 228 N.J.Super. at 455, 550 A.2d 163, where a statement made by an attorney to Johnson & Johnson was found to be sufficiently connected to litigation between the attorney's client and the client's former employer. In that case, we stated
While Johnson & Johnson and its attorney were not parties to the active litigation, they were not strangers to that litigation and could properly have been joined as a party. Johnson & Johnson, even though not a party, had a sufficiently significant interest in the communication and litigation for absolute immunity to apply.
[Id. at 463, 550 A.2d 163.]
In our view, this case before us is distinguishable from DeVivo because, unlike Johnson & Johnson, the Asbury Park Press did not inject itself into the pending litigation. It never asserted any claims against Kenney's client and its records were never subpoenaed. It also had no interest in the outcome of the pending Tarver litigation.
We conclude that courts should not extend the grant of the absolute privilege to novel situations unless the underlying policy on which the privilege is based compels this result. Devlin, 147 N.J.Super. at 456, 371 A.2d 380. Since the privilege is based on the ability to speak freely which is indispensable to the "due administration of justice," Hawkins, 141 N.J. at 214, 661 A.2d 284 (quoting Fenning, 47 N.J.Super. at 117, 135 A.2d 346), we conclude this policy is not served by extending the privilege to extra-judicial statements made by an attorney to a newspaper in anticipation of her client's press conference. We here draw the line between bona fide litigation activities and a public *291 relations campaign. In our view, the litigation privilege should not be extended to "litigating in the press." Rothman, 57 Cal.Rptr.2d at 294. The January 16, 2002 letter to the editor of the Asbury Park Press which repeats rather salacious gossip not really germane to the pending litigation was plainly a warm-up for the next-day press conference, not a legitimate litigation undertaking.

VI
On the second point, the judge's refusal to hold that the letter was protected by the litigation privilege because it was a pre-litigation demand letter in anticipation of a future lawsuit against the Asbury Park Press was clearly correct. We affirm on this point for the reasons stated by the Law Division judge.
Although the Asbury Park Press and plaintiff may have been exposed to a claim by Tarver for defamation, Kenney's letter did not clearly and unambiguously inform them of possible future legal action if their conduct continued. Rather, the subject of the letter was clearly Tarver's lawsuit against the State. The letter did not refer to the possibility of a suit against plaintiff and the newspaper or to the alleged defamatory nature of the articles. Moreover, Kenney had not been retained by Tarver to sue the newspaper, and Tarver had specifically consulted with another attorney for that purpose. Kenney's own employment by the newspaper on a part-time basis might have even presented a conflict of interest with regard to her instituting litigation against it and plaintiff.
That Tarver contemplated a lawsuit against the newspaper, and that Kenney might have contemplated adding plaintiff and the newspaper as defendants to the underlying Tarver litigation, did not change the fact that the letter Kenney sent to plaintiff's editor made no reference to threatened litigation or to the newspaper's liability. The letter complained that the newspaper had published an "incomplete" version of the facts and that it might be publishing another article that was "slanted" in favor of the OPD. The letter did not state that false statements had been published or that plaintiff had conspired with anybody. It did not ask the recipient of the letter to cease any conduct or risk being sued.
Even more significantly, Tarver never actually sued either plaintiff or the newspaper. Although the privilege perhaps can apply where a complaint is never filed, the fact that one was not filed here lends support for our conclusion that, at the time the letter was sent, litigation was never considered seriously in good faith. See generally Scott Fetzer Co. v. Williamson, 101 F.3d 549, 554 (8th Cir.1996).
Affirmed in part, reversed in part, and remanded.